## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JUDITH CATE,

     Plaintiff,

   v.                                       Case No. 16-11703

THETFORD CORPORATION,

     Defendant.

_____/

### OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
### AND DENYING MOTION TO STRIKE

Plaintiff Judith Cate claims that she was terminated by Defendant Thetford

Corporation due to her age in violation of the Age Discrimination in Employment Act

(ADEA), 29 U.S.C. § 626(c), and the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws

37.2101 *et seq.* (Dkt. # 1.) Before the court is Defendant's motion for summary

judgment (Dkt. # 25). The motion is fully briefed, and a hearing is unecessary. *See* E.D.

Mich. LR 7.1(f)(2). For the reasons that follow, the court will grant the motion.

### I.   MOTION TO STRIKE

Before addressing the summary judgment motion, the court must resolve the

issue of Defendant's reply brief. (Dkt. # 33.) Defendant filed its summary judgment

motion on March 20, 2017. (Dkt. # 25.) After notice from the court that Defendant's brief

in support exceeded the 25 pages allowed pursuant to E.D. Mich. LR 7.1(d)(3)(A), the

parties agreed to a stipulated order allowing additional pages and time to file briefs.

(Dkt. # 27.) Plaintiff timely filed her response brief on April 21, 2017, within the 51-page

limit set by the court's stipulated order. (Dkt. ## 27, 28.) The stipulated order allowed

Defendant until May 8 to file its reply, which was not to exceed 14 pages—twice the 7 pages allowed by E.D. Mich. LR 7.1(d)(3)(B). (Dkt. # 27.) On May 3, 2017, Defendant filed an ex parte application to exceed the stipulated page limit, asking for 20 pages rather than 14 (Dkt. # 30.) Defendant requested the extra pages to address a "new, or at the very least, unanticipated 'failure to hire/transfer' claim'" among other arguments. (*Id.*) Defendant requested that in the alternative, the court extend the due date for the reply brief by two days. (*Id.*) Plaintiff filed a brief opposing Defendant's request (Dkt. # 31), to which Defendant replied (Dkt. # 32).

With no response from the court on its request, Defendant filed a 20-page reply brief on May 8, 2017. (Dkt. # 34.) Defendant attached 3 exhibits to its reply brief, 2 of which are relevant here. The first is a 9-page "evidence chart" examining in detail what Defendant alleges are misrepresentations of the record made in Plaintiff's response brief. (*See* Dkt. # 33-1.) The second is a two-page, single-spaced "summary of undisputed facts" purporting to set out facts admitted to, or at least not controverted, by Plaintiff's brief. (Dkt. # 33-2.)

The next day, May 9, 2017, Plaintiff filed a motion to strike Defendant's reply brief in its entirety as improper and filed without leave of court under Federal Rule of Civil Procedure 12(f) and E.D. Mich. LR 7.1. (Dkt. # 34.) Defendant filed a response (Dkt. # 35), to which Plaintiff has declined to reply.

First, the court admonishes Defendant for—again—filing an overlong brief without leave. While the court is sympathetic to the anxiety produced by four days of silence from this court following Defendant's application, the court is not satisfied with Defendant's request that, should the court decline to grant extra pages, the court grant

2

extra time. (Dkt. # 30, Pg. ID 1401.) Defendant could have easily filed a brief that complied with the court's prior order alongside what might be called its "director's cut." Instead, Defendant assumed that the court's default position would be that more is better. Indeed, not satisfied with the 6 extra pages it requested in its ex parte application, Defendant attaches 11 pages of exhibits addressing matters ordinarily dealt with in the body of the brief. (*See* Dkt. # 33-1, 33-2.)  While the court is generally open to additional briefing, particularly when that briefing is helpful and well-drafted, it is less enthusiastic about parties circumventing its orders—even when those orders appear as mundane as page and time limits.

Neither is the court thrilled with Plaintiff's motion to strike (Dkt. # 34). To start, the motion incorrectly invokes Federal Rule of Civil Procedure 12(f)—which is limited to pleadings by its own text—rather than the court's inherent power to control its docket, *see Zep Inc. v. Midwest Motor Supply Co.*, 726 F. Supp.2d 818, 822 (S.D. Ohio 2010) (citing *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516 (6th Cir. 2003)). More fundamentally, given that Plaintiff had already opposed Plaintiff's request, and the court is capable of recognizing when a party's briefing exceeds page limits without motion practice, the motion needlessly multiplies filings, burdens the court, and delays resolution of the substantive dispute.

The court will deny Plaintiff's motion to strike (Dkt. # 34). However, in light of Defendant's failure to follow the court's stipulated order (Dkt. # 27), the court declines to consider pages 15 through 20 of Defendant's brief.

## II. MOTION FOR SUMMARY JUDGMENT

### A. BACKGROUND

The following facts are undisputed unless otherwise noted. Defendant "manufactures sanitation products for the RV, marine, camping and truck markets and is headquartered in Ann Arbor, Michigan." (Dkt. # 25, Pg. ID 382.) Defendant initially hired Plaintiff on April 10, 1984, as an Accounts Receivable Clerk in the Accounting Department, when she was 28 years old. (Dkt. # 25-3, Pg. ID 442, 451.) In or around 1999, when Plaintiff was approximately 43, she applied for and was transferred into, the "quality secretary" position at Defendant's Baker Road production facility in Dexter, Michigan. (*Id.* at Pg. ID 451-52.) In 2005, when Plaintiff was approximately 49 years old, the quality secretary position was eliminated. (*Id.* at Pg. ID 453.)

When the quality secretary position was eliminated, Plaintiff became the "operations secretary" or "operations administrative assistant" in the operations department at the Baker Road facility. (*Id.* at Pg. ID 452.) Plaintiff testified that she did "a lot of the job" she did as quality secretary in addition to working as a receptionist, "doing metrics[,]" ordering supplies, and coordinating the plant's "stop for safety" program, among other responsibilities. (*Id.*)

### 1. The termination

Plaintiff's supervisor was Gay Youngblood, Plant Manager of the Baker Road facility. (Dkt. # 25-3, Pg. ID 452.) Youngblood testified that Plaintiff's job "is the position that comes up every time we talk about financial reductions . . . that position has been up numerous times." (Dkt. # 25-6, Pg. ID 487.) Youngblood testified that her supervisor, Wayne Lorek, specifically mentioned Plaintiff's position once or twice in that context.

(*Id.*) Lorek died suddenly in March 2015. (Dkt. # 25-7.) After Lorek passed away, Youngblood reported to Kevin Phillips, Defendant's president. (Dkt. # 25-6, Pg. ID 488.)

Phillips and Youngblood had weekly meetings after Lorek's death (Dkt. # 25-6, Pg. ID 489.) She met with Phillips in May of 2015 to discuss "decisions that [Lorek] had made" before he passed away, and he told her that "there were some things that we needed to talk about in regards to the financial condition of the company. And there were some activities that needed to be done. And the one was to look at the admin job at Baker Road." (*Id.* at Pg. ID 488-89.) Phillips also directed Youngblood not to replace another employee, Tim Kulpinski, who had recently quit. (*Id.*) According to Youngblood's testimony, this was in response to the loss of a significant customer (RV manufacturer Forest River), "and we were being asked to do the best that we could to eliminate cost to help offset the loss of profit." (*Id.*) Youngblood "felt that [she] could have talked to [Phillips]" about the decision to eliminate Plaintiff's position but she is "not sure that there would have been any different conclusion because it was pretty black and white in dollars and cents" and that her impression at the time was that the "cake was baked as far as Judy Cate was concerned[.]" (*Id.*)

In another meeting with Phillips, at "the very end of June[,]" Youngblood testified that Phillips "wanted to know when [Youngblood] was going to eliminate the position." (*Id.* at Pg. ID 489.) At that point, Youngblood informed Phillips that Plaintiff's position would be eliminated at the beginning of July. (Dkt. # 25-6, Pg. ID 489.)

Youngblood and Carey met with Plaintiff on July 10, 2015, to inform Plaintiff that her position would be terminated. (Dkt. # 25-6, Pg. ID 491.) Plaintiff was informed that she was not being terminated for performance reasons, it was "nothing personal," and

her position was being eliminated. (Dkt. # 28-3, Pg. ID 777-78.) Plaintiff was offered a severance package with a separation agreement, and Youngblood informed her that she could also take the consumers job. (*Id.*) The separation agreement identifies Plaintiff as an "Administrative Assistant," states that Plaintiff's "position is being eliminated[,]" and the agreement "is not part of any group reduction in force." (Dkt. # 28-11, Pg. ID 975.) That day, Youngblood also put out an announcement to all employees stating, "Effective immediately, the Reception position at the Dexter Operation has been eliminated." (Dkt. # 25-9.)

### 2.  The "consumers" or "production" position

After it was decided that Plaintiff's position would be eliminated, Youngblood spoke to Defendant's Human Resources Generalist, Lisa Carey, about getting Plaintiff a job "on the shop floor." (Dkt. # 25-6, Pg. ID 489.) Youngblood testified that Defendant had never taken a "white collar" employee and "put them in blue collar" before, so she needed approval to offer the position to Plaintiff. (*Id.*) Youngblood's plan was approved by Vice President of Human Resources Rob Trax. (*Id.*)

She then approached Operations Manager Neil Bates for approval to offer Plaintiff a job "in the consumers area[.]" The consumers area is where "after-market items are assembled and packaged and boxed." (Dkt. # 25-8, Pg. ID 499.) Youngblood believed that, as plant manager, she could keep Plaintiff from being placed "on the line" doing physically demanding labor and that the consumers job would never be lost to a reduction in force. (Dkt. # 25-6, Pg. ID 490.) Bates approved. (*Id.*) Youngblood testified that she pursued this option for Plaintiff "[b]ecause Judy is a good person, and Judy I

know needed to work and she needed her insurance, and I was trying to think of a way that I could help her." (*Id.*)

It is unclear how much Plaintiff knew about the consumers position. Youngblood testified she told Plaintiff "[t]hat [Bates] had agreed we would put her in consumers and we would not move her out to any of the lines." (Dkt. # 25-6, Pg. ID 491.) Plaintiff testified that Youngblood said "something about a job in production" at either Baker Road or Jackson Road and, more specifically, she was told Bates "could put [her] in consumers, but nothing more than that." (Dkt. # 28-3, Pg. ID 777.) Plaintiff testified that working in consumers involves making "small kits and packages and things like that." (Dkt. # 25-3, Pg. ID 454.) However, she also testified that "when you're in production, they can put you wherever they want you" and that she did not believe she was physically capable of doing the work that she could potentially be asked to do as part of working in production. (Dkt. # 28-3, Pg. ID 780.) Plaintiff ultimately declined both the consumers position and the severance package, and was terminated at 59 years old. (Dkt. # 25, Pg. ID 388; Dkt. # 28, Pg. ID 698.)

Plaintiff's briefing claims that she was only offered the opportunity to "apply for a 'production job' and was told that Neal [sic] Bates . . . 'could put her in consumers, but nothing more than that.'" (Dkt. # 28, Pg. ID 697 (quoting Dkt. # 28-3, Pg. ID 777) (emphases added by Plaintiff).) But nothing in Plaintiff's deposition testimony suggests that she was asked to apply for the consumers position rather than offered it outright— Plaintiff testified that she had until Sunday, July 12, 2015, to "decide if [she] wanted to take a job in production" and she "could either choose Baker Road or Jackson Road." (Dkt. # 28-3, Pg. ID 777.) Plaintiff also cites to Trax's deposition testimony, where he

responds "yes" to the question "We spoke earlier about Ms. Cate's termination meeting and that she was offered the opportunity to apply for a position in production. Is that fair?" (Dkt. # 28-5, Pg. ID 891.) But the "earlier" deposition questioning referred to is explicit that Plaintiff was offered the job—specifically, Plaintiff's counsel asked if Trax knew about the "production job that was offered to Ms. Cate during the termination meeting"; if he knew "whose decision it was to offer Ms. Cate the production job"; and if "there was any other discussion about offering Ms. Cate any other open positions[.]" (*Id.*, at Pg. ID 891.) Trax also explained that he did not attend the termination meeting, and that all he knows about the meeting is secondhand from Carey. (*Id.* at Pg. ID 887.) The court concludes there is no genuine dispute that Plaintiff was offered the consumers position, not an opportunity to apply for the position.

### 3.  The marketing position

At the July 10 termination meeting, Plaintiff also asked about a "marketing administrative assistant" position, and Carey told her the position was "under review." (Dkt. # 25, Pg. ID 393; Dkt. # 28, Pg. ID 703.)

Andrea Conway resigned from the marketing administrative assistant position on June 23, 2015, about three weeks prior to Plaintiff's termination meeting. (Dkt. # 25-14.) The position was part of Defendant's marketing department, while Plaintiff's position was part of the Production Department. (Dkt. # 25-6, Pg. ID 485-86.) Carey, Defendant's human resources generalist, testified that Conway's sudden resignation triggered "kind of a reaction to start recruiting for that[.]" (Dkt. # 25-8, Pg. ID 499.) Carey was part of the recruiting effort for that position. (*Id.*)

Carey discussed the marketing position with Defendant's director of marketing Andy Bialorucki on June 25, 2015. (Dkt. # 28-17.) The next morning, Carey emailed Rob Trax, stating that Bialorucki "does not want to change the [marketing administrative assistant] job," beyond making it "a salaried position (because of the attendance policy)" and Carey had told Bialorucki "that wasn't how it works." (*Id.* at Pg. ID 1061.) Carey told Trax that Bialorucki said "he had the role just where the department needed it to be." (*Id.*) Carey and Bialorucki created a job posting with a description reflecting the initial decision to keep the position's responsibilities the same. Carey published the posting on June 30, 2015. (Dkt. # 28-20, Pg. ID 1128.)

The June 30 posting stated that "any employee interested in being considered for the position may do so by contacting Lisa Carey in the Human Resource Department on or before 4:00 pm, Thursday July 2, 2015." (Dkt. # 25-16.) In addition to the internal posting, Carey reached out to a firm called "Manpower Staffing." (Dkt. # 25-8, Pg. ID 501.) None of Defendant's employees applied for or expressed interest in the marketing administrative assistant position while it was posted, and no one was interviewed. (*Id.*)

Carey testified that after the posting came down, "[i]t was very quickly determined that it would be something different" (Dkt. # 25-8, Pg. ID 501), and that "[a]fter the internal posting came down and even while the posting was up there was discussion about making that position something different than what it had been previously." (*Id.* at Pg. ID 499.) Plaintiff testified that after the posting went down on July 2, but before she was terminated on July 10, Carey told her that Carey was "actively recruiting" to fill the marketing administrative assistant position. (Dkt. # 28-3, Pg. ID 783.) According to Carey, two days prior to the termination meeting, on July 8, 2015, she spoke with Trax

about the marketing position and "confirmed with him at that time that [the marketing position] would no longer be a marketing administrative assistant position." (Dkt. # 25-8, Pg. ID 500.) Carey testified she reached out to Trax because she thought Plaintiff would ask about the position, and "wanted to confirm and be able to provide an answer to her if she asked." (*Id.*)

On July 30, 2015, Plaintiff's counsel notified Defendant of Plaintiff's age discrimination claims. (Dkt. # 28-15.) On August 3, 2015, Carey sent Trax a draft job description for a "marketing coordinator" position (Dkt. # 25-15), and submitted a requisition form for the position on August 11, 2015. (Dkt. # 25-18). Defendant describes the marketing coordinator position as "newly created" (Dkt. # 25, Pg. ID 393), while Defendant claims it "was a pretextual title change" (Dkt. # 28, Pg. ID 704.) The coordinator job description attached to the requisition form lists two to three years of marketing experience as a requirement (Dkt. # 25-18), while the administrative assistant description lists only "[u]nderstanding of [m]arketing programs and promotions" (Dkt. # 25-16). The coordinator position was also scored one level higher on Defendant's salary grading scale, demanding a higher salary (Dkt. # 25-19.)

On August 26, 2015, Carey emailed a recruiting firm about the marketing coordinator position, stating:

> A four year degree is preferred… but if you have someone with a 2 year degree and some practical work experience to go with it, we would certainly be interested. This is a position that most definitely has room to grow. Typically we would think of a recent college grad as the right candidate, but someone who is switching gears in their career or starting a career a little later in life would work as well. As you and I discussed, this position currently has administrative responsibilities that will help to build the foundation for a solid career (in marketing)…the candidate needs to be okay with doing some of that work as well as the more relevant Marketing work.

This position reports to the Director of Marketing North America.
(Dkt. # 25-20.) Plaintiff has no marketing experience, but does have an associate's
degree in accounting. (Dkt. # 25-3, Pg. ID 459.) Plaintiff testified that Carol Taylor,
Defendant's "Marketing Events Supervisor" who was involved in the interview process,
told her in fall 2015 that "what they wanted in a person" for the marketing job "seemed
to be changing daily." (*Id.* at Pg. ID 450.) In her deposition, Taylor agreed with defense
counsel that the marketing coordinator position involved "higher responsibility than what
an admin typically would be expected to do[,]" stating there were "differences in it.".
(Dkt. # 28-34, Pg. ID 1392-93.)

Plaintiff points to a September 1, 2015 email from Carey to Trax recommending a
candidate who had "the Admin and multi-task skill set I believe the position requires..
[sic] no marketing background specifically but a desire to grow and great initiative
according to [the outside staffing firm's representative]." (Dkt. # 28-18, Pg. ID 1071.)
The identified candidate had no college degree and had approximately 25 years of
experience doing secretarial work. (*Id.* at Pg. ID 1073.)

In late October or early November, Defendant offered the marketing coordinator
position to Christie Wilson, a recent college graduate with a degree in advertising. (Dkt.
# 28-20, Pg. ID 1131; Dkt. # 28-18, Pg. ID 1078.) Wilson declined the offer because she
had already accepted a position somewhere else. (Dkt. # 28-20, Pg. ID 1131.)

On or around October 28, 2015, presumably after the coordinator position was
offered to Wilson, Defendant again changed the job description of the open position,
this time to a "marketing analyst." (Dkt. # 25-22.) The new job description listed as
requirements an undergraduate degree "with a preferred major in [m]arketing or
business" and "3-5 years practical developmental [m]arketing experience." (*Id.*)

11

On December 22, 2015, Defendant's customer service manager Cindy Fields emailed Carey to formally apply for the marketing analyst position. (Dkt. # 25-23.) On January 4, 2016, Defendant's Vice President of Sales and Marketing Barry Eckel emailed Trax and Bialorucki about the most recent draft of the marketing analyst job description, stating, "Bottom line—I do not want an admin role. I want a candidate to have key responsibilities for job functions that may or may not be administrative in nature. Admin is part of all our jobs. Typically lower level marketing roles simply have more than senior roles—whereas Senior roles have strategic decision making/planning elements." (Dkt. # 25, Pg. ID 397.)

Defendant formally announced that Cindy Fields was awarded the marketing analyst position on January 14, 2016. (Dkt. # 25-26.) Fields is 44 years old and has an undergraduate degree in marketing. (Dkt. # 25-27, Pg. ID 596.) Defendant characterizes Fields's move to the marketing analyst position as a demotion because she no longer supervises anyone, is paid less, and went from a corner office to a "cube." (Dkt. # 28, Pg. ID 707.) Fields testified that she applied for the marketing analyst position because she thought her customer service manager position might be eliminated, she wanted to move into a different, lower-stress position anyway, and she wanted to utilize her marketing degree and background. (Dkt. # 28-23, Pg. ID 1191.)

The parties dispute whether the "marketing analyst" position's responsibilities differ from the administrative assistant position in any appreciable way. Fields testified that her marketing analyst position is different than the marketing administrative assistant position vacated by Andrea Conway that Plaintiff inquired about. (Dkt. # 28-23, Pg. ID 1191.) For instance, employees would ask Fields to do administrative tasks that

Conway used to, and her supervisors would occasionally hear and tell her coworkers that "Cindy doesn't do that." (*Id.* at Pg. ID 1192.) Fields does not believe she works in an "admin position." (*Id.* at Pg. ID 1179.)

Plaintiff disagrees. Attached to Plaintiff's opposition brief is an affidavit signed by Plaintiff on April 21, 2017, stating that "[t]he majority, if not all, of the tasks, responsibilities, or duties performed by Ms. Fields are tasks responsibilities, and duties I performed as an Administrative Assistant." (Dkt. # 28-16.) Taylor, who works with Fields regularly, testified, "based on the duties I see and what [Fields] told me she's working on, yes, I think admin could do that role and it's similar to that role." (Dkt. # 28-34, Pg. ID 1396.)

Plaintiff also relies on the affidavit and deposition testimony of benefits and payroll administrator Connie Wessel.  Wessel's affidavit states that "[a]fter Ms. Cate's termination, a Marketing Administrative Assistant position was posted" for the position vacated by Conway. (Dkt. # 28-27, Pg. ID 1275.) Wessel's affidavit also avers that after Plaintiff was terminated, Defendant "asked other employees if they would fill the marketing Administrative Assistant Position, including Kelsey Richards, Heather Ing, and Wendy Cottone, who are all younger than 40 years old. They all turned down the position." (*Id.*) During her subsequent deposition, Wessel testified that the she "believe[d]" the three were considered for "the original admin job" as opposed to a "market position that was later created[.]" (Dkt. # 25-26, Pg. ID 1253.) When asked what she based that belief on, Wessel replied, "That's what I remember. I don't know if—I don't think they put the new [sic] basically a marketing position until after they had talked with these people, but I don't know." (*Id.*) Wessel testified that Carol Taylor told

her that "they were interviewing them for the position after the posting had gone down" (*id.* at Pg. ID 1252), and that Taylor had been told this information by J.P. DiMaggio (*id.* at Pg. ID 1253). In addition to Taylor, Wessel testified that Richards had told her she had interviewed for the position but declined, but could not recall whether this conversation with Richards took place before or after Plaintiff was terminated. (*Id.*)

Richards is 26 (Dkt. # 28-9), does not have a college degree (Dkt. # 28-30), and transferred to a position as a material planner on May 22, 2015 (Dkt. # 33, Pg. ID 1426). During her deposition, Richards testified that J.P. DiMaggio approached her about a marketing position, but she could not recall when, other than that it was shortly after she started as a material planner. (Dkt. # 25-32, Pg. ID 1310-12.) When asked about the specifics of the job DiMaggio approached her about, Richards testified, "I know it was administrative but I don't—I can't be sure what the exact job title was" and could not recall the specific duties. (*Id.* at Pg. ID 1311.) Sometime after DiMaggio approached her, Richards spoke with Bialorcki about the marketing position as well, in particular about her familiarity with Microsoft Office. (*Id.*) Bialorcki later informed Richards that "they were changing the title and that they needed—they wanted someone with a marketing degree[,]" which Richards did not have. (*Id.*) Richards never formally applied or interviewed for the position. (*Id.*) Carey testified that she "believe[s]" that Bialorucki and DiMaggio spoke with Richards about the marketing coordinator position, not the administrative assistant position. (Dkt. # 28-20, Pg. ID 1129.)

Cottone is 45 (Dkt. # 28-9) and, according to Wessel's testimony, worked as an "admin" in the sales department at the time. (Dkt. # 28-26, Pg. ID 1253.) Wessel testified that Cottone "told [her] that she was interviewed, and she said she did not bid

on it and . . . did not want to work in marketing." (*Id.*) Wessel could not recall when this conversation with Cottone took place, but testified that it was "that same year" i.e., 2015. (*Id.*) No deposition of Cottone appears in the record.

Ing is 25 (Dkt. # 28-9) and a "sales coordinator[,]" which Plaintiff testified is "an administrative job similar to [hers] only in a different department" at the Jackson Road facility. (Dkt. #28-3, Pg. ID 794.) Wessel also testified that Ing was an "admin" still employed by Defendant. (Dkt. # 28-26, Pg. ID 1255.) Nothing suggests Wessel ever spoke to Ing about the marketing position. Taylor, who Wessel testified told her Ing interviewed for the marketing administrative assistant position, did not mention Cottone or Ing in either of her depositions, and did not testify about her purported conversation with Wessel. (*See* Dkt. # 28-34.) No deposition of Ing appears in the record. Neither does a deposition of DiMaggio, who purportedly told Taylor, who purportedly told Wessel, that Ing and Cottone were interviewed for the marketing administrative assistant position. Ing was, however, on the team conducting interviews for the marketing coordinator position. (Dkt. # 28-18; Dkt. # 28-20, Pg. ID 1135.)

Wessel's affidavit—as well as much of her deposition testimony—relies almost entirely on hearsay. According to her deposition testimony, Wessel heard this information from Taylor who heard it from DiMaggio—rendering a significant portion double hearsay—and spoke to Richards and Cottone. (Dkt. # 28-26, Pg. ID 1253.) Further, as explained above, Wessel's hearsay testimony is almost entirely uncorroborated; even Taylor, whose second deposition came after Wessel signed her affidavit and after Wessel was deposed, did not corroborate her testimony or confirm their alleged conversation. Plaintiff may only rely on *admissible* evidence to survive

summary judgment, *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) ("It is well established that a court may not consider hearsay when deciding a summary judgment motion.") (citing *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007)), very little of Wessel's affidavit and relevant testimony clears this hurdle.[1]

Wessel also testified that she did not know which iteration of the marketing position these individuals purportedly interviewed for (Dkt. # 25-26, Pg. ID 1253), contradicting her affidavit stating that they were asked to fill the administrative assistant position (Dkt. # 28-27, Pg. ID 1275). Plaintiff also testified that she could not recall whether her conversations with Richards and Cottone were before or after Plaintiff was terminated (Dkt. # 25-26, Pg. ID 1253) contradicting her affidavit stating that they were asked to fill the position after Plaintiff was terminated (Dkt. # 28-27). An affidavit that directly contradicts sworn testimony is not admissible "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). Plaintiff provides no such justification, and the court cannot imagine one. Accordingly, the court will disregard Wessel's affidavit and these portions of her deposition testimony.

Absent Wessel's inadmissible affidavit and testimony, there is no dispute that Richards, Wilson, and Fields were offered, or at least recruited for, some iteration of the marketing position. Richards testified that she could not remember when she was approached, the job title discussed, or the duties involved, but that she knew it was "administrative." (Dkt. # 25-32, Pg. ID 1310-12.) Carey testified that she "believe[s]" that

---

[1] While Rule 56(c) allows some *forms* of hearsay to be considered, the *content* must still be admissible at trial to be considered. *See Tranter*, 460 F. App'x at 514-15.

Bialorucki and DiMaggio spoke with Richards about the marketing coordinator position, not the administrative assistant position. (Dkt. # 28-20, Pg. ID 1129.)

Plaintiff never applied for the marketing position—in any of its incarnations—or any other job with Defendant after she was terminated. Plaintiff testified that she did not believe she could apply for any jobs with Defendant after being terminated both because of what she understood to be company policy and because of this litigation. (Dkt. # 28-3, Pg. ID 785-86, 805.) In her complaint, Plaintiff claims she was "bypassed for other open positions, including, but not limited to Customer Service Supervisor and Customer Service Representative." (Dkt. # 1, Pg. ID 3.) Carey testified that Plaintiff had once told her she would never want to work in customer service because it "would be terrible to be on the phone listening to people complain all day and talk about their toilets that don't work." (Dkt. # 25-8, Pg. ID 504.) In her affidavit, Plaintiff avers that she did not make this statement. (Dkt. # 28-16, Pg. ID 1057.)

## B. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817

(6th Cir. 2005) (internal quotation marks omitted). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted).

In evaluating a summary judgment motion, "the court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). To do so, the evidence must amount to more than a "scintilla." *Id.* ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."). However, if that threshold is reached, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## C.  DISCUSSION

The ADEA "prohibits an employer from failing or refusing to hire, discharging, or discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]'" *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). "A plaintiff may establish a violation of the ADEA either by direct or circumstantial evidence" *Id.* (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in

the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*) (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* Plaintiff does not offer direct evidence. (Dkt. # 28, Pg. ID 715.)

To establish a prima facie case of age discrimination under the ADEA, Plaintiff must show that: "(1) [she] was at least 40 years old at the time of the alleged discrimination; (2) [she] was subjected to an adverse employment action; (3) [she] was otherwise qualified for the position; and (4) [she] was replaced by a younger worker." *Weatherby v. Fed. Exp.*, 454 F. App'x 480, 489 (6th Cir. 2012) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008)). The parties dispute only the fourth element. "The fourth element may be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 317 (6th Cir. 2007). If Plaintiff makes this showing, the burden of production shifts to Defendant to articulate a nondiscriminatory reason for its action. *Harris v. Metro. Gov't,* 594 F.3d 476, 485 (6th Cir. 2010). If Defendant does so, the burden of production shifts back to Plaintiff to show that Defendant's proffered reason was mere pretext for intentional age discrimination. *Id.* A plaintiff may illustrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002). "The plaintiff retains the ultimate burden of proving that age was the but-for cause of the employer's adverse action." *Harris*, 594 F.3d at 485 (quotations omitted).

### 1.  Workforce Reduction

Defendant first argues that Plaintiff's position was eliminated, i.e., that terminating Plaintiff was a workforce reduction. (Dkt. # 25, Pg. ID 417.). In the Sixth Circuit:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. A person is considered replaced only when another employee is hired or reassigned to perform the plaintiff's duties. A person is not considered replaced when his duties are absorbed by another person or when the work is redistributed among other existing employees already performing related work.

*Geiger*, 579 F.3d at 623 (internal citations and quotation marks omitted) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). In workforce reduction cases, also called "reduction in force" ("RIF") cases, a plaintiff must meet a heightened standard to establish her prima facie case. *Id.* The fourth element is modified such that Plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* (quotations omitted).

Plaintiff contends that her termination was not part of a "*bona fide*" reduction in force. (Dkt. # 28, Pg. ID 719.) Though Plaintiff acknowledges that the elimination of a single position can constitute a reduction in force, citing *Barnes*, 896 F.2d at 1465, Plaintiff argues that the lack of an "objective plan" combined with Defendant's profitability creates a jury question regarding whether this case in fact concerns a reduction in force. (Dkt. # 28, Pg. ID 719-20.) If there was no legitimate reduction in force, Plaintiff claims, she does not need to meet *Geiger*'s heightened standard and may instead prove her prima facie case by showing that a similarly situated employee under 40 was treated more favorably. (*Id.*)

Plaintiff's argument that the reduction in force was not "*bona fide*" does not imply

that there was no reduction in force—rather, it goes to whether the reduction in force

was pretextual. *Geiger* and *Barnes* explain that "[A]n employee is not eliminated as part

of a work force reduction when he or she is replaced after his or her discharge." *Geiger*,

579 F.3d at 623 (quoting *Barnes*, 896 F.2d at 1465)). Even if a position is eliminated

entirely due to an impermissible motive, so long as Plaintiff is not replaced, there is still

a workforce reduction—the workforce reduction is pretextual. This explains why the

case on which Plaintiff relies to regarding the "lack of an objective plan," *Blair v. Henry*

*Filters, Inc.*, 505 F.3d 517, 524–25 (6th Cir. 2007), *overruled on other grounds by Gross*

*v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 n.4 (2009), discusses that issue in the

context of meeting the modified fourth prong and pretext, not whether the termination

actually was part of a reduction in force. *Id.* Similarly, *Kulling v. Grinders for Industry,*

*Inc.*, 115 F. Supp.2d 828, 840 (E.D. Mich. 2000) (Rosen, J.) discussed the lack of clarity

regarding whether another employee was transferred into the terminated plaintiff's

former role before concluding that the plaintiff set out a prima facie case either way. *Id.*

Plaintiff does not dispute that her responsibilities were spread out among a

variety of other employees—only whether this fact is material. (*See* Dkt. # 28, Pg. ID

698 ("Neither admit nor deny that Cate's job duties were assumed by others and further

state that these are not material facts.").) As a result, Plaintiff's complaints about bonus

payments to executives and that Defendant's financial situation did not prevent it from

offering Plaintiff a position in production are inapposite. *See Schram v. Schwan's Sales*

*Enterprises, Inc.*, 124 Fed. App'x 380, 384 (6th Cir. 2005) (finding evidence that

defendant company did not *need* to eliminate the plaintiff's position "cannot refute the

undisputable fact that the Company did indeed reduce the number of division manager positions by one" and is "irrelevant to the determination of whether a RIF occurred"). As it is undisputed that Defendant did in fact eliminate the "operations administrative assistant" position and reduce the administrative staff in that department, the court concludes that Plaintiff's elimination was, in fact, a reduction in force.

### 2. Prima facie case

Plaintiff must produce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons" to satisfy the modified fourth prong of the prima facie case requirement. *Geiger*, 579 F.3d at 623 (quotations omitted). "The purpose of the additional evidence requirement is to ensure, in reduction [in] force cases, that the plaintiff has presented evidence to show that there is a chance the reduction in force is not the reason for the termination." *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006). Defendant argues that Plaintiff has not met this higher burden and, therefore, fails to make out a prima facie case. (Dkt. # 25, Pg. ID 419.) The court agrees.

### a. Failure to transfer

Plaintiff contends that Defendant's failure to offer her the marketing position both satisfies and "stands alone." (Dkt. # 28, Pg. ID 723-27.) The court will find that Plaintiff cannot set out a prima facie case in either context.

"Although an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, the employer violates the ADEA when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination." *Ercegovich v. Goodyear Tire & Rubber*

*Co.*, 154 F.3d 344, 351 (6th Cir. 1998) (citations omitted). The *Ercegovich* court defined

the prima facie case for a failure to transfer claim as follows:

> In other words, a plaintiff denied an opportunity to transfer establishes a
> prima facie case of age discrimination when he or she produces evidence
> demonstrating that 1) he or she is a member of a protected class; 2) at the
> time of his or her termination he or she was qualified for other available
> positions within the corporation; 3) the employer did not offer such
> positions to the plaintiff; and 4) a similarly-situated employee who is not a
> member of the protected class was offered the opportunity to transfer to
> an available position, or other direct, indirect, or circumstantial evidence
> supporting an inference of discrimination.

*Id.* It is undisputed that only Plaintiff's position was eliminated in the workforce reduction

in question[2]—thus, no similarly-situated employees under 40 were offered an

opportunity to transfer. Accordingly, Plaintiff must provide "other . . . evidence

supporting an inference of discrimination" in addition to showing that she was qualified

for other available positions that were not offered to her. *Id.* Plaintiff has failed to do so.

Defendant argues that the position was "under review" at the time of Plaintiff's

termination, so Plaintiff cannot show the position was "available" and a different

position, for which Plaintiff was not qualified, was ultimately filled. (Dkt. # 33, Pg. ID

1426.) In support, Defendant points to the fact that the job posting required applications

by July 2 and had been taken down; Carey's testimony about ongoing deliberations

regarding the position and telling Plaintiff that the position was under review when

asked; and that the marketing position was not filled until 6 months later, with a different

title and a higher pay grade, by an individual with qualifications that Plaintiff does not

have. The court is inclined to find that whether the position was actually available is

disputed. Either way, Plaintiff cannot satisfy the fourth element of the prima facie case.

---

[2] With the exception of Tim Kulpinski, who had already quit and Phillips directed
Youngblood not to replace. (Dkt. # 25-6, Pg. ID 489.)

Plaintiff relies heavily on *Schram v. Schwan's Sales Enterprises.* (*See* Dkt. # 28, Pg. ID 723.) In *Schram,* the 57-year-old plaintiff sued his former employer, a frozen food company based in Marshall, Minnesota, for age discrimination pursuant to an Ohio statute analyzed under the same framework as the ADEA. 124 Fed. App'x at 383. Schram was terminated when, as part of a national reorganization to increase profitability, Schwan's consolidated its four Ohio divisions into three, purportedly selecting Plaintiff for elimination because his division was the smallest, and offering the new divisions to the other, younger division managers. *Id.* at 382. Schwan's offered Schram a demotion to sales manager with the same salary and benefits, which Schram did not accept. *Id.* The day after Schram was told he would be terminated, a manager of one of the three newly-created divisions announced his retirement. *Id.* The outgoing manager had previously notified the individual who decided to terminate Schram that he intended to retire, but had not "made it final." *Id.* Schwan's subsequently hired a 35-year old with less experience and less time with the company for the newly-vacated division manager position, and never told Schram that the position had become vacant. Because Schwan's could have offered him the division manager position as it had for the other division managers, but instead terminated him and offered the position to a younger man with less experience, the Sixth Circuit found Schram had "put forth sufficient evidence to establish a prima facie case" under the reduction in force standard, and reversed the lower court's grant of summary judgment. *Id.*

Plaintiff contends that her case is "factually on all fours with *Schram.*" (Dkt. # 28, Pg. ID 723.) The court disagrees. Schram was denied the opportunity to transfer given to the other three division managers subject to the same reduction in force. 124 Fed.

App'x at 383. This is critical—*Ercegovich* specifically provides that the fourth element is satisfied by showing that "a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position." 154 F.3d at 351. Further, the position Schram was denied went to someone under 40. Schram, 124 Fed. App'x at 383. When combined with denying Schram the opportunity to transfer given to every other division manager in Ohio, including the one the defendant expected to retire shortly, Schram's employer essentially replaced him with someone younger—the heart of the prima facie case.

This is more explicit in another case cited by Plaintiff—*Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. Appx. 620 (6th Cir. 2010). Thompson, a black woman, was terminated as part of a reorganization of the food production department of the hospital where she was employed. *Id.* at Pg. ID 624. The process involved the creation of a new position that occupied "the same structure within the hierarchy of the kitchen and included managing and reporting to the same people" as Thompson's position. *Id.* Thompson was not given the opportunity to transfer to the new position, for which a white male was hired. *Id.* The Sixth Circuit, explaining that the claim may be "better analyzed as a failure to transfer[,]" the Sixth Circuit held there was a question of fact "regarding whether the two positions were substantially similar so that [the new hire] replaced Thompson" and found Thompson could make out a prima facie case. *Id.*

Plaintiff was not denied a transfer opportunity given to other, younger employees subjected to the same RIF or essentially replaced by someone outside of her protected class—she was simply not allowed a transfer to a particular position that was eventually filled by someone over 40. The court has been unable to locate, and Plaintiff does not

provide, a single prior case finding that a reasonable jury could conclude that a terminated employee set out a prima facie case even though the employee was not replaced and the position to which the employee was denied her preferred transfer was filled by a member of the employee's protected class. Given that employers are "under no obligation to transfer to another position in the company an employee whose position has been eliminated[,]" *Ercegovich*, 154 F.3d at 351, the court finds that this does not set out a prima facie case for Plaintiff's "stand alone" failure-to-transfer claim, or suggest that her position was eliminated because of her age.

### b.  Other evidence

Plaintiff also offers "comparative statistics" intended to show a "very striking age disparity between 2012/14 RIFs and retained employees." (Dkt. # 28, Pg. ID 721.) Seven employees were terminated during those reductions in force, out of approximately 160 employed by Defendant throughout that time period. (Dkt. # 25-11; Dkt. # 25-11, Pg. ID 510.) Assuming that, as Defendant states, the average age of Defendant's employees in 2012 was 46.8 and 46.3 in 2014 (Dkt. # 25-11), the "average age of RIF'd employees was 59.8, a difference of 13.5 years" (Dkt. # 28, Pg. ID 721 (emphasis in original)). Plaintiff also contrasts the average age of employees terminated for cause in 2012 through 2016 (38.8), "6.5 years less than the lowest average age for that period." (*Id.* (emphases in original).) Plaintiff than emphasizes the "21-year age gap" between employees whose termination had to be justified . . . and employees who were RIF'd because of 'the financials[.]'" (*Id.* (emphasis in original).) Additionally, Plaintiff alleges that Defendant identified 14 employees terminated with no stated reason between 2013 and 2016, 12 of whom were over 40, and 8 over 50; as well as 13

employees whose "employment ended with no stated reason" between 2010 and 2016, all of whom were over 40, and 9 of whom were over 50. (Dkt. # 28, Pg. ID 701.) Plaintiff contrasts these with the 20 employees "terminated <u>with</u> a reason" in 2012 through 2016, half of whom were under 40. (*Id.*) Defendant does not contest these numbers.

Plaintiff contends that these "very striking age disparit[ies]" are such that they "cause the average person to scrutinize the employer's motive" and "lead the mind naturally to the conclusion sought"—namely, that Defendant terminated Plaintiff for impermissible reasons, quoting *Simpson v. Midland Ross Corp.*, 823 F.2d 937 (6th Cir. 1987). Plaintiff is correct that statistical evidence can support a prima facie case for age discrimination in reduction in force cases, as explicitly held by *Geiger*, 579 F.3d at 623, and *Barnes*, 896 F.2d at 1465, among others. But as one of Plaintiff's own cited cases explains, Plaintiff generally may not simply point to a numerical disparity and call it a day—she must also "eliminate[] the most common non-discriminatory explanations for the disparity." *Allen v. Diebold, Inc.*, F.3d 674, 677-78 (6th Cir. 1994) (citing *Barnes*, 896 F.2d at 1466; other citations omitted).Plaintiff provides little context for these numbers, does not identify what type of positions were eliminated or in which department, does not discuss the age of Defendant's newly hired employees over that time, and selects different date ranges for the various data sets without explanation.

Further, only seven employees were subject to reductions in force since 2010, a sample size that severely limits the reasonableness of drawing any inferences therefrom.  *See Simpson*, 823 F.2d at 943, n.7 (describing reliance of sample of 17 as "suspect" and collecting cases stating that small statistical samples "provide little or no probative force to show discrimination"); *Wilson v. Wells Aluminum Corp.*, 107 F.3d 12

(table) (6th Cir. 1997) (upholding district court determination that sample size of seven was too small to be probative). Plaintiff provides no statistical analysis to indicate the likelihood that her proffered disparities could occur absent age discrimination, and the court lacks the necessary expertise to make those calculations on its own. For all of these reasons, the court concludes that Plaintiff's proffered "comparative statistics" are of comparatively insignificant probative value.

Finally, Plaintiff invokes *Cichewicz v. Unova Indus. Automotive Sys., Inc.*, 92 F. App'x 215 (6th Cir. 2004), in which the Sixth Circuit found that even when only six employees were laid off in the series of reductions in force at issue and "the record contains little, if any, information about these [five] additional firings[,]" that all of them were over 40 was "sufficient to suggest a pattern of targeting only older individuals for discharge." *Id.* at 219-20. But the plaintiff in *Cichewicz* was terminated and given no opportunity to transfer. *Id.* Here, Defendant offered Plaintiff a different position and continued hiring individuals over 40, such as Fields. It would be a strange company indeed that endeavored to reduce the percentage of its workforce over 40 by offering a new, specially-created position to the only employee it terminated and hiring a new employee over 40 to fill the position that the first one wanted. Further, there was no record of any employees under 40 being subject to recent reductions in force in *Cichewicz.* 92 Fed. App'x at 219-220 ("No evidence was produced to contradict [evidence] that only the older employees were targeted for terminations in [the defendant's] downsizing.") Here, two employees under 40 were subject to RIFs in 2008. (Dkt. # 25-36, Pg. ID 656). The court finds that the reasoning in *Cichewicz* does not apply here.

Plaintiff also relies on *Clchewicz* in her attempt to set out a "pattern and practice" of age-based discrimination by referencing a variety of past allegations of discriminatory actions and comments allegedly made by various employees. While pattern-or-practice evidence "may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnel Douglas* framework[,]" *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004), Plaintiff's claim is not "otherwise-viable" for the reasons discussed above. In any event, most of the proffered evidence appears inadmissible, irrelevant, or otherwise valueless.[3]

Essentially, Plaintiff has failed to point to admissible evidence in the record suggesting that a similarly situated-employee outside of her protected class received better treatment. Though Plaintiff was terminated, she was not replaced by a younger worker. No similarly-situated employee was offered the transfer opportunity allegedly denied to Plaintiff. And, finally, even assuming the position in question was in fact available at the time Plaintiff was terminated, and did not change in any material respect, it was ultimately filled by someone over 40—a member of Plaintiff's protected class. Plaintiff has failed to point to relevant, admissible evidence sufficient to make out a prima facie case either for her termination under the heightened standard imposed in workforce reduction cases, *see Geiger*, 579 F.3d at 623, or for a "stand alone" failure to transfer claim. As a result, Defendant is entitled to summary judgment. *Id.*

---

[3] In particular, the court notes that much of Taylor's extensive notes of alleged bias incidents (Dkt. # 25-30) relate to events that purportedly took place in 2006, involve actors not arguably involved here, constitute multiple levels of hearsay, or describe incidents that Taylor testified were not related to age. (*See* Dkt. # 28-34.)

## III. CONCLUSION

IT IS ORDERED that Defendant's motion for summary judgment (Dkt. # 25) is GRANTED.

IT IS FURTHER ORDERED that Defendant's ex parte motion to file excess pages (Dkt. # 30) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion to strike (Dkt. # 34) is DENIED.

s/Robert H. Cleland                            /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 26, 2017


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 26, 2017, by electronic and/or ordinary mail.

s/Lisa Wagner                            /
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\16-11703.CATE.summary.judgment.grant.TLH3.docx